JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON, EDMUND B. LEAMING, JAMES E. HOWELL, VIVIAN M. LEWIS, JOHN H. BACKES AND JOHN GRIFFIN, VICE-CHANCELLORS.

---

In the matter of FRANK THOMPSON, a prisoner in custody by virtue of an executive warrant of extradition.

[Decided November 5th, 1915.]

1. The right of a state to demand the extradition from another state of persons who have committed offences against the former's laws, but who have fled to such other state, is founded upon the constitution of the United States, and is not dependent on interstate comity, courtesy or contract.

2. The purpose of the provision of the United States constitution with reference to the requisition of criminals is to impose an absolute obligation on each state to surrender criminals fleeing from the justice of another state.

3. If the demand made by one state for the surrender of a fugitive criminal from another state be in due form, and the requisite documents be exhibited, showing that the fugitive is charged with crime in the demanding state, the duty of the governor of the state where the fugitive is found, and upon whom the demand is made to surrender the criminal, becomes merely a ministerial one.

4. Because the power of the governor of a state, upon whom demand is made for a fugitive criminal, is ministerial and without the right to exercise executive or judicial discretion, the person arrested by virtue of an executive warrant of extradition has the right to invoke the judgment of judicial tribunals, by virtue of *habeas corpus*, to inquire into the lawfulness of his arrest and imprisonment.

5. The governor of a state upon whom requisition is made for the extradition of a fugitive from justice, is not obliged to hear the accused, or receive evidence in his behalf, before ordering his transportation to the demanding state. The person demanded has no constitutional right to be heard before the governor, and whatever in that respect may be accorded by the governor to the accused is a matter of grace; and, therefore, unless the accused may review his extradition on *habeas corpus*, he may be transported as a prisoner without a hearing; and he may have such review whether the governor has accorded him a hearing or not, as an executive warrant of extradition is but *prima facie* sufficient for his transportation.

6. A person illegally restrained of his liberty may have *habeas corpus* out of a state court unless he is held in custody by authority of the courts of the United States, or officers of the federal government acting under its laws.

7. On *habeas corpus* testimony will not be weighed as to the presence in, or absence from, the demanding state, of an alleged fugitive from justice, at the time of the stated commission of a crime therein by him, and on *habeas corpus* it is not competent to try the question of *alibi*, or the guilt or innocence of the accused.

8. The writ of *habeas corpus ad subjiciendum* is a common law writ, confirmed and regulated by statute, which did not create, but came in aid of, the jurisdiction. The writ issued out of the court of chancery, king's bench, common pleas and exchequer in England.

9. In this state the power of the chancellor to grant a writ of *habeas corpus* was, by the common law and the *Habeas Corpus* act of March 11th, 1795, the power to issue the writ out of the court of chancery.

10. The *Habeas Corpus* act of March 27th, 1874, contains no reference to the chancellor or the court of chancery; but it was impotent, in the slightest degree, to curtail or abridge the chancellor's power with reference to that ancient and efficacious writ, for that jurisdiction, existing at common law, was inherited by our court of chancery from its prototype the high court of chancery in England, was recognized and confirmed by the *Habeas Corpus* act of March 11th, 1795, and was vested in, and guaranteed to, our court of chancery by the constitution of 1844.

11. The legislature cannot impair the jurisdiction of a constitutional court, either by preventing its exercise or creating a co-ordinate authority.

12. The writ of *habeas corpus* awarded by the chancellor is always issued out of the court of chancery; and the legislature recognized this in the act of April 5th, 1878, which declares the chancellor to have and to have had the power to issue writs of *habeas corpus* under the seal of the court of chancery, in the same manner as if the act of March 27th, 1874, had not been passed and the act of March 11th, 1795, had never been repealed.

13. *Habeas corpus* is a high prerogative writ issuing out of a court, and whether allowed by, and made returnable before, a court composed of several members, or whether allowed by a single judge. and made returnable before him, it is a proceeding in that court in which it, or the single judge, exercises jurisdiction.

14. *Habeas corpus* cannot be had as of course, but when cause is shown for its issuance it becomes a writ of right.

15. If the *Habeas Corpus* act of *31 Car. II. 1679*, which regulated the writ issuing out of chancery as well as out of the courts of common law, was ever in force in New Jersey, it was doubtless repealed by implication upon the passage of our *Habeas Corpus* act of March 11th, 1795, which made similar provisions, but, if not, it was expressly repealed by our act relative to statutes passed June 13th, 1799; and as the act of 1795 was repealed in 1874, and as the *Habeas Corpus* act of that year makes no mention of the chancellor or the court of chancery, there is now no statute of this state which regulates the writ of *habeas corpus* which issues out of the court of chancery by the common law, and, therefore, the *allocatur* on such writ should omit the words "by the statute," and the endorsement should be: "This writ is allowed: Let it be sealed;" the same to be signed by the chancellor, or the vice-chancellor advising, awarding the writ.

16. The office of master of the rolls and of master in chancery, as the source of the jurisdiction of the vice-chancellors, reviewed; and the power of the vice-chancellors, as assistants to the chancellor, to award the writ of *habeas corpus* out of the court of chancery, considered and stated.

17. The chancellor's power and duty with reference to *habeas corpus* being always in the court of chancery, it follows that section 111 of the Chancery act (*Comp. Stat. p. 450*), which provides that all persons aggrieved by any order or decree of the court of chancery may appeal from the same to the court of errors and appeals, gives the right of appeal to a person unsuccessfully prosecuting a *habeas corpus* case in chancery.

18. When a prisoner petitions for a writ of *habeas corpus* out of chancery he thereby commences a suit and prosecutes a cause in that court; and, being aggrieved by the decision, may appeal to the court of errors and appeals.

19. Our constitution provides that all persons shall, before conviction, be bailable by sufficient sureties, except for capital offences where the proof is evident or presumption great. (Article 1, section 10.) But this— like the provision that the right of trial by jury shall remain inviolate (article 1, section 7), which does not enlarge the right—is not intended to extend the right of bail to cases where it did not previously exist.

In re Thompson. . *85 N. J. Eq.*

20. As New Jersey has no power to convict an offender against the criminal laws of the State of New York, it has no power to enlarge on bail a person accused of an offence against the laws of that state, unless that power resides in the authority whereby such person is arrested here.

21. Our statute of April 1st, 1889, in aid of the execution of the federal law of extradition, provides that when application has been or is about to be made to the governor of this state for the extradition of a person, it shall be lawful for a magistrate to issue a warrant for the arrest of such person and commit him or take bail for his appearance from day to day, not to exceed thirty days. The power thus conferred upon a magistrate to take bail in extradition proceedings is a power which did not exist before the passage of the act of April 1st, 1889. That act makes no provision for any proceedings after the governor's warrant has issued and the person accused has been apprehended under it.

22. No right to bail exists at common law in favor of a person taken up on an extradition warrant, for extradition is not a proceeding according to the course of the common law, but one which exists between different nations by virtue of treaty obligations, and between the states of the Union by virtue of the constitution of the United States and of the federal and state statutes passed in aid of the execution of the provisions thereof; but there is no statute of this state authorizing a person charged with crime in another state, and arrested on the governor's warrant of extradition, to be admitted to bail.

23. When a person is brought before a judge on *habeas corpus* he should be instantly committed to some proper custody pending the proceedings, else, if he elope, the officer or other person producing him will not be liable for his escape. Ordinarily the subject of a writ of *habeas corpus* would be committed *pendente lite* to the custody of the officer or person producing him. Not so in cases where the accused has been taken up on the governor's extradition warrant and is in the custody of, and is produced by, the agent of the demanding state, who could not compel his incarceration in any of our jails, awaiting the determination of proceedings. The court, in such a situation, may commit the accused to any jail in this state, and should commit him to the most convenient one, all things considered.

On *habeas corpus.*

*Mr. Robert H. Ingersoll,* for the prisoner.

*Mr. Herbert Boggs,* assistant attorney-general of New Jersey, with whom was *Mr. Louis Fabricant,* deputy assistant district attorney of the county of New York, for the State of New York.

This was a *habeas corpus* proceeding before the chancellor who delivered an oral opinion which he has reduced to writing, amplified and edited for the reporter, as follows:

WALKER, CHANCELLOR.

### THE FACTS.

A petition was presented to the chancellor by Frank Thompson of Ventnor, Atlantic county, showing that he was in the custody of William F. Boyle, an agent of the State of New York, by virtue of a certain extradition warrant made and issued by the Honorable Walter E. Edge, president of the senate, acting governor of the State of New Jersey, during the temporary absence of Governor Fielder from the state (*Consl., art. 5, ¶ 13; P. L. 1898 p. 11*), a copy of which warrant was annexed to the petition, which petition alleged that Thompson's imprisonment was unlawful because he was not under indictment in the State of New York, nor was he a fugitive from the justice of that state; therefore he prayed that he might be brought before the chancellor on a writ of *habeas corpus* to be issued pursuant to the statute in such case made and provided, to the end that he might be discharged out of custody.

A writ of *habeas corpus* was thereupon issued under the seal of the court of chancery, directed to Mr. Boyle, commanding him to have the body of Thompson before the chancellor at the state house in Trenton on June 1st, 1915, to do and receive what should then and there be considered concerning him. Pursuant to the command of the writ Boyle produced the body of Thompson at the time and place specified, and returned in writing that he was designated by the governor of New York, as his agent, to take the body of Thompson, for whom the governor of that state had issued a requisition upon the governor of New Jersey, for the rendition of Thompson by the latter to the proper authorities of New York, as a fugitive from justice, stating that Thompson was in his custody by virtue of a warrant issued by the acting governor of New Jersey, agreeably to the demand of the executive of New York, a copy of which warrant was annexed to and made part of the return.

On the hearing a certified copy of an indictment found against Thompson by the grand jury of the county of New York, in the State of New York, charging him with the crime of keeping

a room to be used for gambling, and of being a common gambler, in that city and state on April 12th, 1915, against the law of that state, and an affidavit made by an officer of New York that Thompson was in that city on the date mentioned, were offered in evidence.  Because Thompson alleged, as one of the reasons why his imprisonment was unlawful, that he was not under indictment in the State of New York, it is pertinent to remark that there need be no indictment but only an affidavit charging the person demanded with having committed crime in the foreign state.  *U. S. Rev. Stat.* § *5278, infra.*

Nine witnesses, including Thompson, swore that he was in Ventnor, Atlantic county, during all of the day of April 12th, 1915; and two witnesses, a detective officer of New York and a bell-boy of the Murray Hill hotel, New York City, testified that Thompson was in that hostelry on the date mentioned. The clear preponderance of the testimony was in favor of the *alibi* set up by Thompson; and the question for solution was, whether or not a judge, on *habeas corpus,* has the right to decide that question and discharge the prisoner from arrest under the governor's extradition warrant, if the disputed fact be decided in his favor.

At the close of the hearing I adjourned the matter until June 8th, at the state house, for the purpose of considering the briefs and arguments of counsel, and took bail for the appearance of the prisoner at the day and place mentioned.  On the adjourned day he appeared according to the condition of the bail bond.

### AS TO EXTRADITION.

Extradition is of two kinds, international and interstate. There is no obligation upon a government, under the law of nations, to surrender fugitive criminals to a foreign power in the absence of treaty or statutory provisions.  *19 Cyc. 52.*  The United States has treaties of extradition with upwards of thirty foreign governments.  *Ibid. 53,* and *note 9.*  With this we are not here concerned.

The right of a state to demand the extradition from another state of persons who have committed offences against its laws

but who flee to such other state, is founded upon the constitution of the United States, and is not dependent on interstate comity, courtesy or contract. The provision of the federal constitution is general and not self-executing, and the congress of the United States and the legislature of this state have passed statutes which define the course of action to be pursued in the execution of this constitutional provision.

The federal constitution (article 4, section 2) provides that—

"A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of that state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

The federal statute for carrying into execution the above mentioned provision of the constitution of the United States is section 5278 of the United States revised statutes, and reads as follows:

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, and produces a copy of the indictment found or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing and transmitting such fugitive to the state or territory making such demand, shall be paid by such state or territory."

Our supreme court, speaking by the late Chief-Justice Beasley, *In the Matter of Peter Voorhees, 32 N. J. Law 141* (at *p. 145*), held that one of the purposes of the provision of the United States constitution was "to impose an absolute obligation on each state to surrender criminals fleeing from the justice of another state."

And (at *p. 146*), "If the demand be made in due form, and the requisite documents exhibited, showing that the fugitive is charged with crime, the duty to surrender becomes merely a ministerial one. Under such circumstances, to refuse to authorize the extradition is a clear infraction of the rule prescribed in the constitutional clause above quoted. I think it, therefore, indisputable, that the constitution has made the surrender of a fugitive from justice, which by the law of nations depends on the concessions of comity, a rule of law of perfect obligation and entirely imperative in its character."

The supreme court of the United States, in *Roberts* v. *Reilly, 116 U. S. 80* (at *p. 94*); *29 L. Ed. 544, 548*, quoted with approval Chief-Justice Taney in *Kentucky* v. *Dennison, 24 How. (U. S.) 66, 104*, who there held that the duty of the governor of a state, where a fugitive was found, is merely ministerial, without the right to exercise executive or judicial discretion; and that this lack of executive power is recognized as the right of a person arrested by virtue of an executive warrant in interstate extradition, to invoke the judgment of judicial tribunals, state or federal, by virtue of *habeas corpus* to inquire into the lawfulness of his arrest and imprisonment.

Acting Governor Edge, after giving Thompson a hearing, rightly conceived it to be his duty to comply with the demand of the governor of New York, and he made and issued his executive warrant, which is the justification pleaded by Mr. Boyle, the agent of the governor of New York, who, Boyle, had the defendant in his custody ready to transport him to that state.

However, the governor upon whom requisition is made for a fugitive from justice, is not obliged to hear the accused before ordering his removal. The person demanded has no constitutional right to be heard before the governor. *Munsey* v. *Clough, 196 U. S. 364; 49 L. Ed. 515.*

It was held in *People, ex rel. Corkran,* v. *Hyatt, 172 N. Y. 176* (at *p. 193*), that no law gives a person sought to be extradited the right to a hearing before the governor or to submit evidence in his behalf; that whatever in that respect may be accorded by the governor to the accused is a matter of favor,

not of right; and that, therefore, unless the accused may review his extradition on *habeas corpus,* he may be transported as a prisoner without any hearing. But, as held by the United States supreme court in *Hyatt* v. *State of New York, 188 U. S. 691; 47 L. Ed. 657,* the executive warrant of a governor of a state is but *prima facie* sufficient to hold the accused, and he may have *habeas corpus* to test the validity of such a warrant. See also *Katyuga* v. *Cosgrove, 67 N. J. Law 213.* And *habeas corpus* proceedings are within the cognizance of state courts, unless the persons held are in custody by authority of the courts of the United States, or officers of the federal government, acting under its laws. *Robb* v. *Connolly, 111 U. S. 624; 28 L. Ed. 542.*

We come now to the merits of the present proceeding, and reliance is placed by the accused upon the decision of the supreme court of the United States in *Illinois, ex rel. McNichols,* v. *Pease, 207 U. S. 100; 52 L. Ed. 212,* in which Mr. Justice Harlan, delivering the opinion of that court, deduced several principles from certain leading cases, which he cited. Among these principles is one (7) that a person arrested and held as a fugitive from justice is entitled upon *habeas corpus* to question the lawfulness of his arrest and imprisonment, showing by competent evidence, as ground for his release, that he was not, within the meaning of the federal constitution and laws, a fugitive from the justice of the demanding state, and thereby overcome the presumption to the contrary arising upon the face of the warrant of extradition. It is insisted that this gives the accused in the matter at bar the right to call upon this court to decide upon the conflicting testimony as to the *alibi* set up; and the further language of the learned judge in the case just mentioned may seem to bear out the contention, for (at *p. 111*), he said:

"Upon the record before us it must be taken that McNichols was charged with committing the crime in question on the 30th day of September, and that he could have been at Kenosha during the forenoon of that day, although he may have been, as stated in the affidavits, in Chicago during the whole of the afternoon of the same day. So that the accused entirely failed

to overcome the *prima facie* case made by the official documents before the court of his having become a fugitive from the justice of Wisconsin, after committing a crime against its laws on the 30th day of September, 1905."

However, as McNichols could have been in Wisconsin, but failed to produce evidence that he was not there at the very time when the offence with which he was there charged was committed, it was not decided that if he had by a preponderance of testimony established an *alibi,* he must have been discharged. And I cannot believe that the court would have so held, because *Munsey* v. *Clough, supra,* is one of the cases cited by Mr. Justice Harlan as authority for the very rule which counsel for the accused relies upon, and in that case (*Munsey* v. *Clough, 196 U. S. 364* (at *p. 374*) ; *49 L. Ed. 515, 517,* Mr. Justice Peckham, speaking for the court, says:

"When it is conceded, or when it is so conclusively proved that no question can be made, that the person was not within the demanding state when the crime is said to have been committed, and his arrest is sought on the ground only of a constructive presence at that time, in the demanding state, then the court will discharge the defendant. *Hyatt* v. *New York, 188 U. S. 691; 47 L. Ed. 657; 23 Sup. Ct. Rep. 456;* affirming the judgment of the New York court of appeals, *172 N. Y. 176; 60 L. R. S. 774; 92 Am. St. Rep. 706; 64 N. E. Rep. 825.* But the court will not discharge a defendant arrested under the governor's warrant where there is merely contradictory evidence on the subject of presence in or absence from the state, as *habeas corpus* is not the proper proceeding to try the question of *alibi,* or any question as to the guilt or innocence of the accused."

And in *Hyatt* v. *New York, supra,* another of the cases cited by Mr. Justice Harlan as authority for his rule, it was held by Mr. Justice Peckham, speaking for the supreme court of the United States, in *188 U. S. 691* (at *p. 711*) ; *49 L. Ed. 657, 661:*

"In the case before us it is conceded that the relator was not in the state at the various times when it is alleged in the indictment the crimes were committed, nor until eight days after the time when the last one is alleged to have been committed. That

the prosecution on the trial of such an indictment need not prove with exactness the commission of the crime at the very time alleged in the indictment is immaterial. The indictments in this case named certain dates as the times when the crimes were committed, and where in a proceeding like this there is no proof, or offer of proof, to show that the crimes were in truth committed on some other day than those named in the indictments, and that the dates therein named were erroneously stated, it is sufficient for the party charged to show that he was not in the state at the times named in the indictments; and when those facts are proved so that there is no dispute in regard to them, and there is no claim of any error in the dates named in the indictments, the facts so proved are sufficient to show that the person was not in the state when the crimes were, if ever, committed."

There is nothing in the case of *Katyuga* v. *Cosgrove, 67 N. J. Law 213,* in our supreme court, to the effect that the determination of the executive authority in the state where the demand is made, is sufficient to justify the apprehension and removal of the person demanded until the presumption in its favor is overcome by contrary proof, nor in the case in the United States supreme court of *Ex parte Reggel, 114 U. S. 642; 29 L. Ed. 250,* cited as authority in *Katyuga* v. *Cosgrove,* which militates against the view above expressed. In fact, in the *Reggel Case,* it was held that the fugitive from justice should not be discharged because in the judgment of the court the proof showing him to be such fugitive may not be as full as might properly have been required.

Enough, I think, has been shown to indicate that it was not the intention of the supreme court of the United States, in *Illinois* v. *Pease,* to depart from the doctrine theretofore clearly established in that tribunal, namely, that, on *habeas corpus,* testimony would not be weighed as to the presence in, or absence from, a demanding state, of an alleged fugitive from justice, at the time of the stated commission of a crime therein by him, and that, on *habeas corpus,* it is not competent to try the question of *alibi,* or of the guilt or innocence of the accused.

*In re Greenough, 31 Vt. 279* (at *p. 288*), it was held: "The court, upon *habeas corpus,* cannot pronounce upon the guilt or innocence of the alleged fugitive. That must be left to the courts

of that state where the crime is alleged to have been committed."
See *Commonwealth* v. *Superintendent, &c.* (*Pa.*), *69 Atl. Rep.
916.* See, also, *Drew* v. *Thaw, 235 U. S. 432; 59 L. Ed. 302.*

This view harmonizes with the decisions of the courts of our
state as to where the decision of a disputed question of fact ulti-
mately resides, namely, with a traverse jury. With us the weight
of conflicting testimony must always be submitted·to a jury for
their consideration and determination. See *Dickinson* v. *Erie
Railroad Co., 85 N. J. Law 586; Clark* v. *Public Service Elec-
tric Co., 86 N. J. Law 144; Tilton* v. *Pennsylvania Railroad
Co., 86 N. J. Law 709.*

As there is competent evidence before me tending to establish
the fact that the accused was in the city and State of New York
on the day mentioned in the indictment against him, it becomes
my duty to deny his discharge. Let him be remanded to Mr.
Boyle, the agent of the governor of New York, for transportation
to that state.

Mr. Ingersoll—If your honor please, the defendant has in-
structed me to take an appeal from your decision, and I ask your
honor to fix bail so that the defendant may be at large pending
appeal. Your honor admitted him to bail *pendente lite,* and I
understand he is entitled to bail pending appeal.

The Chancellor—Anticipating that you might desire to ap-
peal and ask for the prisoner's discharge on bail, I looked into
those questions and find that the prisoner is entitled to appeal,
but not to bail. I am now satisfied that I erred in admitting
him to bail *pendente lite,* as will appear from what I shall say
later on.

### AS TO THE RIGHT OF APPEAL.

Of course, you do not need my say so that you are entitled to
appeal. You are at liberty to institute that proceeding, and the
court above will dismiss you if the appeal does not lie. But it
becomes necessary for me to consider and decide that question,
because if you are not entitled to appeal your client must be re-
manded to custody, and the question of bail will not arise. And
this court may determine any question incidentally and neces-
sarily involved, although its determination, if directly presented,

would not be within its jurisdiction, such decision having no binding effect except in the case in which it is made. See *Dunham* v. *Marsh, 52 N. J. Eq. 256, 261.* See, also, *In re Baker, 61 N. J. Eq. 592, 599; In re Alexander, 79 N. J. Eq. 226, 228.*

The right to appeal in the case at bar does not reside in our *Habeas Corpus* act (*Comp. Stat. p. 2561*), because that act (in section 53) only accords that right to prisoners in criminal causes on *habeas corpus* before a justice of the supreme court. The right of appeal, therefore, if it exists, must be found in the Chancery act, and that involves the question as to whether this proceeding is one before the chancellor as a commissioner or legislative agent *designatio personæ*, or is one in the court of chancery itself. This question will now be examined at considerable length, because there are expressions in the books about the writ of *habeas corpus* being issued by the *court* or a *judge*. In fact, our statute on *habeas corpus* provides for it, and, lest it be thought that the writ, when granted by a single judge, becomes a proceeding before him dissociated from the court of which he is a member, I will be at pains to show that the writ is always a judicial one issuing out of a court, whether awarded by the court itself or by one of its judges; and that the proceeding thereon is a cause or suit in the given court.

The writ of *habeas corpus ad subjiciendum* is a common law writ confirmed and regulated by statute. The purpose of the writ, as so regulated, is the same as at common law. *Bail. Hab. Corp. § 3 p. 9.*

In *Church Hab. Corp. (2d ed.) § 25a*, it is laid down:

"It was not to bestow an immunity from arbitrary imprisonment, which is abundantly provided for in Magna Charta—if, indeed, it were not much more ancient—that the statute of Charles II. was enacted; but to cut off the abuses by which the government's lust of power, and the servile subtlety of crown lawyers, had impaired so fundamental a privilege."

And in section 61:

"The origin of this (common law) jurisdiction over the writ of *habeas corpus* is lost in antiquity. It was, we have seen from the history of the writ, undoubtedly exercised before Magna Charta, and it extends to all cases of illegal imprisonment, whether claimed under public or private

authority. It was exercised by the court of chancery, king's bench, common pleas, and exchequer, * * * At one period it was thought that the writ of *habeas corpus ad subjiciendum*—which was only for matters of crime—could issue out of the king's bench only in term time; but Watson's Case settled it that the king's bench, or a judge thereof, might grant the writ, at common law, in vacation, and that it might be made returnable immediately either before the court or a judge at chambers. Prior to the *Habeas Corpus* act of *31 Car. II.*, however, the king's bench rarely issued the writ in vacation. The general practice was that suitors could obtain it regularly from that court in term time only, and this evil practice it was one of the objects of the act to remedy. The court of chancery, however, was always open, and would grant the writ in vacation as well as in term time, though it seems that the general practice in that court was to issue it in vacation only. The writ was returnable to the authority whence it issued. If it issued in vacation it was usually made returnable before the judge himself who awarded the writ, and he proceeded thereon unless the term should intervene, when it could be returned into court."

Our supreme court has decided that *habeas corpus* is a common law, and not a statutory, writ. *Dickinson* ads. *State Bank, 16 N. J. Law 354.* See, also, *Morris Canal and Banking Co.* v. *Vannatta, 17 N. J. Law 159.*

In *State, Baird, pros.,* v. *Baird and Torrey, 19 N. J. Eq. 481, 488,* the court of errors and appeals questioned whether an appeal would lie in a strict *habeas corpus* proceeding. This was in 1868, and it may be that this decision moved the legislature to grant an appeal in section 53 of the *Habeas Corpus* act of 1874. No provision for appeal was made in our earlier *Habeas Corpus* act of 1795. That statute was closely copied from the *Habeas Corpus* act of *31 Car. II.*

Our statute of March 11th, 1795, did not create the writ of *habeas corpus* as a means of preventing the injury of illegal confinement, but recognized its existence and legislated with reference to it as a common law writ. It provided, in section 1, that whenever any person should bring a writ of *habeas corpus* directed to any sheriff or other person, that that officer or other person should make return to the writ and bring the body of the party committed or restrained before the chancellor for the time being, or the justices of the supreme court, or such of them before whom the writ was made returnable, according to the command thereof. In section 3 it was enacted that if any person be committed or detained (except, &c.) out of term and

in vacation time, such person, or any one in his behalf, might apply to "the chancellor, or any one of the justices of the supreme court; and the said chancellor or justices, or any of them," were authorized and required "to award and grant a *habeas corpus* under the seal of such court, whereof he shall be then one of the judges," to be directed, &c., and in section 10 it was enacted that it should be lawful for any person to move and obtain his *habeas.corpus*

"as well out of the court of chancery as out of the supreme court, and if the chancellor or any justice of the supreme court for the time being * * * shall deny any writ of *habeas corpus* by that act required to be granted * * * they shall severally forfeit to the prisoner," &c.

It is apparent to me that the power of the chancellor to grant a writ of *habeas corpus,* was by the common law and by our *Habeas Corpus* act of March 11th, 1795, a power to issue the writ out of the court iteslf.

Our legislature seventy-nine years later passed a new *Habeas Corpus* act which is entitled "An act for preventing the injury of illegal confinement, and better securing the liberty of the people," approved March 27th, 1874 (*Rev. (1877) p. 468; Comp. Stat. p. 2638*), and on the same day the *Habeas Corpus* act of 1795, which was passed by exactly the same title, was expressly repealed. *Rev. (1877) p. 1383.* The *Habeas Corpus* act of March 27th, 1874, contains no reference to the chancellor or the court of chancery; but was impotent in the slightest degree to curtail or abridge the chancery power with reference to that ancient and efficacious writ; for that jurisdiction, existing at common law, was inherited by our court of chancery from its prototype the high court of chancery in England, was recognized and confirmed by the *Habeas Corpus* act of March 11th, 1795, and was vested in, and guaranteed to, our court of chancery by the constitution of 1844.

In *Bail. Hab. Corp. § 1,* it is stated that—

"It (the writ of *habeas corpus*) was brought to America by the colonists and claimed as among the immemorial rights descended to them from their ancestors."

Thus it appears that *habeas corpus* statutes did not create, but were in aid of, the jurisdiction.

The legislature cannot impair the jurisdiction of a constitutional court. *Flanigan* v. *Guggenheim Smelting Co. (1899), 63 N. J. Law 647.* In that case Judge Adams, speaking for the court of errors and appeals (at *p. 650*), said:

"Section 1, of article 7, of the constitution provides that 'the judicial power shall be vested in a court of errors and appeals in the last resort in all causes as heretofore; a court for the trial of impeachment; a court of chancery; a prerogative court; a supreme court; circuit courts, and such inferior courts as now exist, and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish, as the public good shall require.'

"It will be admitted that these provisions guarantee the integrity of the constitutional courts, of which the supreme court is one. Whatever powers that court had, whatever jurisdiction that court exercised, at the date of the adoption of the constitution, were by such adoption incorporated into the fundamental law and ensured against destruction and abridgment except through a change in the fundamental law itself. To abolish the court, to alter its organic character, to impair its jurisdiction, to diminish its authority, are beyond legislative power, because that character, jurisdiction and authority form part of a body of law, which upon wise grounds, has been made immutable by any mere legislative act. For example, it has been held that the legislature cannot constitutionally deprive the supreme court of its exclusive right to issue, as heretofore, a prerogative writ, either by denying the use of such writ or by creating in another tribunal a co-ordinate authority to employ it."

See also *Smith* v. *Livesey, 67 N. J. Law 269.*

In *Flanigan* v. *Guggenheim Smelting Co.* the court whose constitutional powers were vindicated, was the supreme court, but the decision of course applies with equal force to the court of chancery.

Later, the legislature realizing that the omission of chancery from the *Habeas Corpus* act of 1874 in no way impaired or detracted from its jurisdiction, passed an act entitled "An act

declaratory of the power of the chancellor to issue and determine writs of *habeas corpus,"* approved April 5th, 1878. *P. L. 1878 p. 350; Comp. Stat. 2640 § 3a.* It enacted that the chancellor of this state

"is hereby declared to have and to have had the power to issue writs of *habeas corpus* under the seal of the court of chancery and to hear and determine the same,"

notwithstanding the provisions, or any of them, of the act of March 27th, 1874, in the same manner as if it had never been passed and the act of March 11th, 1795, had never been repealed.

This, however, cannot operate to read the chancellor and the court of chancery into section 53 of the *Habeas Corpus* act of 1874, which gives the right of appeal, restricted to cases before a justice of the supreme court; so, as I said, we must look to the Chancery act for the right of appeal, if this cause is one in the court itself.

I hold that the writ of *habeas corpus* awarded by the chancellor is always issued out of the court of chancery, and the legislature recognized that fact in the declaratory act of April 5th, 1878; for it will be remembered that the declaration of the chancellor's power is one to issue the writ "under the seal of the court of chancery." And the act of March 11th, 1795, seems to have contained the same recognition, for it provided for the issuance of the writ out of the court of chancery and the supreme court; and where provision was made for the chancellor or justices of the supreme court to grant the writ, it provided that it should be under the seal of the court of which he should be a judge.

That the writ of *habeas corpus* always issues out of a court appears from the following English cases. The *italics* are mine.

*In re Belson, 7 Moo. P. C. R. 114,* it was held (at *p. 115*) :

"The lord chancellor or the *court* of chancery, has by the common law jurisdiction, authority to issue writs of *habeas corpus,* and the authority appears to have been exercised in a manner as general, as the like authority by the *courts* of common law, and moreover is exercised in vacation, when it is supposed at least, that such writs cannot be issued by the other *courts.* *Coke, 2 Inst. 53, 54; 4 Inst. 81, 182.*

And (at *p. 132*) :

"Moreover these writs, whether with or without the clause. '*cum causis,*' were always prepared in the six clerks' office, and are now always sealed in the record and writs clerk's office. In 1736, a prisoner committed by a certain justice of the peace, petitioned to be brought up to be bailed. The lord chancellor ordered that the petitioner's clerk in *court* should issue out a writ of *habeas corpus* under the seal of the *court,* &c., and such has always been the course for whatever purpose the writs are required."

The expressions "the lord chancellor" and "the court of chancery," *In re Belson, supra,* I take to be synonymous, like "ordinary or surrogate-general" to be found in our constitution, referring to one and the same office and officer. If I am right in holding, as I do, that the writ of *habeas corpus* is a judicial writ always issuing out of court, then the chancellor is not divorced from the court of chancery in the matter of *habeas corpus* jurisdiction. The court of errors and appeals, in *Delaware Bay, &c., Railroad Co.* v. *Markley, 45 N. J. Eq. 139,* in which the question was whether a receiver was appointed by the chancellor as a mere commissioner empowered to do a special act (the statute empowering the *chancellor* to act), or whether such appointment was made by the court of chancery, it was held that the name "receiver" implies a person deriving his authority from the *court* as he is one of the well known agents of chancery, with powers, immunities and responsibilities entirely defined, from which, and like considerations, the court was of opinion that it was plainly the legislative intent to lodge the appointing power in the court of chancery. The analogy which I invoke is this: That the *habeas corpus* awarded by the chancellor must be issued out of the court of chancery because it issues under the seal of the court and on its return the hearing is of a *judicial question or questions,* which can only be determined by the court.

In Indiana it is provided by statute that a receiver may be appointed by the court or the judge thereof, in vacation, in certain cases, and in *Pressley* v. *Lamb, 105 Ind. 171* (at *p. 184*), it was held:

"When the judge of a court, in vacation, is engaged in doing these acts and making these orders, it is clear, we think, that he is exercising *quoad hoc* 'the judicial power of the state,' and that his acts, orders and proceedings in the premises, although had in vacation, are the judicial proceedings of the court whereof he is judge."

This question of the judicial character of the hearing in these cases will be dealt with more at length hereafter.

In *2 Hale P. C. 147*, it is laid down:

"By virtue of the statute of Magna Charta, and by the very common law, an *habeas corpus* in criminal causes may issue out of the *chancery. Coke on Magna Charta, cap. 29 and 2 Instit. p. 255.*"

In *Watson's Case, 9 Ad. & E. 731; 112 Eng. Rep. 1389,* it was held:

"At common law, a judge of the *court* of king's bench may grant in vacation a writ of *habeas corpus ad subjiciendum,* returnable immediate at chambers, to bring up the body of a party in custody in execution of a criminal sentence. After the return to the *habeas corpus* has been put in and read, it is considered as filed; but the *court* has nevertheless power to amend it."

And Lord Chief-Justice Denman, delivering the judgment of the court, said (at *p. 1409*):

"We are now to pronounce our judgment on the validity of a return to a writ of *habeas corpus* for bringing up the body of Randal Wixon, being in the custody of the keeper of her majesty's gaol at Liverpool. The writ was issued by my brother Littledale, returnable forthwith before himself at his chambers in Serjeants' Inn; but the term was so near at hand that it was thought expedient to hear the argument in the *full court.*"

By the statute of *1 and 2 P. & M. c. 13* § 7, it is provided

"That no writs of *habeas corpus* or *certiorari* shall be hereafter granted to remove any prisoner out of any gaol, or to remove any recognizance, except the same writs be signed with the proper hands of the chief justice, or in his absence one of the justices of the *court* out of which the same writs shall be awarded or made; upon pain that he that writeth any such writs, not being signed as is aforesaid, to forfeit to our said sovereign lord the king and the queen, for every such writ or writs, five pounds."

In *Ex parte Watkins, 3 Pet. (U. S.) 193, 202; 7 L. Ed. 653,* it was held that the writ of *habeas corpus* is a high prerogative writ, known to the common law. This very expression is approvingly cited by our supreme court in *Peltier v. Pennington, 14 N. J. Law 312* (at *p.* 318). Only courts have power to issue prerogative writs.

Sir William Blackstone treating of the writ of *habeas corpus* says (*3 Bl. Com. 131*):

"This is a high prerogative writ, and therefore by the common law issuing out of the *court* of king's bench not only in term-time, but also during the vacation, by a *fiat* from the chief justice or any other of the judges. * * * If it issues in vacation, it is usually returnable before the judge himself who awarded it, and he proceeds by himself thereon; unless the term should intervene, and then it may be returned in court."

The learned commentator goes on to question the right of chancery to issue the writ *in vacation,* citing *Jenks' Case;* but that case was overruled by Lord Eldon in an elaborate judgment, and is not the law in England or the United States. See *Church Hab. Corp. (2d ed.) § 17.*

It was in *Crownley's Case, 2 Swanst. 1,* that Lord Chancellor Eldon overruled Lord Nottingham in *Jenks' Case,* observing (at *p. 68*):

"We now come to *Jenks'. Case,* certainly a positive decision that the lord chancellor could not grant the writ at common law in vacation; and Lord Nottingham says that he conferred with the judges; but it does not appear that on that occasion all the authorities in the books had been consulted, and every consideration given to the subject; and it is not going too far to say that a case which is capable of being rendered so doubtful as that is rendered, when we look at all the proceedings in it, I cannot think one which ought to bind me against the stream of authority."

Lord Eldon, in overruling Lord Nottingham, followed the previous *dicta* of the illustrious Lords Coke and Hale. *Church Hab. Corp. § 61 note 2.*

Now, as above observed, Mr. Justice Blackstone says that the writ issues out of court, but that if in vacation it is usually re-

turnable before the judge who awarded it. And my understanding, from the above authorities, is, that when a single judge by his *fiat* orders the issuance of the writ out of the court of which he is a member and hears and determines the matter, he exercises the jurisdiction of the court, for the court itself could exercise no other or higher power in that regard. In other words, the jurisdiction of the court or the single judge is the same—that is, the jurisdiction of the court itself.

Another thing: The writ of *habeas corpus*, as already stated, is a prerogative writ. *3 Pet. (U. S.) 193; 7 L. Ed. 653, supra.* So are writs of *certiorari, mandamus* and *quo warranto*. *Certiorari* is a writ issued by a superior to an inferior *court* of record. *1 Bouv. L. Dict. (Rawles' rev.) 301*. *Mandamus* is a high prerogative writ, usually issued out of the highest *court* of general jurisdiction in a state. *2 Ibid. 330*. The issuance of writs of *quo warranto* rests in a sound discretion of the *court*. *Ibid. 809*. And our statutes treat of them as *issuing out of court*. The writ of *certiorari* may be allowed by a justice of the *court* out of which it issues. See *Mott's Prac. Act 133*: *Mandamus* shall issue out of the *supreme court*. *Ibid. 155*. Leave to file an information in the nature of *quo warranto* may be granted by the *supreme court*, or a *justice* thereof in vacation. *Ibid. 146*. This is exactly analogous to the issuance of a writ of *habeas corpus* by the *supreme court*, or a *justice* thereof. The writ of injunction is also a high prerogative writ. *Gear v. Shaw (Wis.), 1 Pinn. 608, 615*. So is the writ of *ne exeat*. *Collison* v. ——, *18 Ves. Jr. 353*.

In *Short Inform.* *223, the author states:

"By the phrase 'high prerogative writ,' is meant a writ issuing, not as ordinary writs, of strict right, but at the discretion of the sovereign acting through that court, in which the sovereign is supposed to be personally present."

Our form of the writ of *habeas corpus* itself shows that it is issued from and out of *court*. The *Habeas Corpus* act of 1874, in section 6, prescribes substantially the form of the writ. It commands the production of the body "before our justices of our supreme court, &c. (or before E. F., justice, &c.)," and con-

cludes "Witness, &c.," not providing in whose name it shall be witnessed. It is contained in our form books as follows:

(1) Returnable "before our justices of our supreme court, &c. (or before J. D., Esq., justice of our supreme court), at, &c.  *  *  *  Witness M. B., Esq., chief justice of our said supreme court," &c.  *Bess. L. Prec. 299.*

(2) Returnable "before our justices of our supreme court, at the state house, at Trenton (or, before M. M. K., Esq., justice of our supreme court, at the court house in the city of J.)  *  *  *  Witness the Honorable M. B., chief justice of our supreme court," &c.  *Corb. For. 781.*

(3) Returnable "before our justices of our supreme court, &c. (or before A. R., Esq., justice of our supreme court) at, &c.  *  *  *  Wit ness M. B., Esq., chief justice of our said supreme court," &c.  *Jeff. L. Prec. 361.*

(4) Returnable "before our justices of our supreme court, &c. (or, before A. Q. G., Esq., justice of our supreme court) at, &c.  *  *  *  Witness W. S. G., chief justice of our said supreme court," &c.  *Prout N. J. L. For. 288.*

(5) Returnable "before . . . . . . . ., Esquire, one of the justices of our supreme court (or as the case may be) at, &c.  *  *  *  Witness . . . . . . . ., Esq., chief justice of our said supreme court," &c.  *Honeym. N. J. L. For. 463.*

Thus, in all these forms, the writ, whether it be allowed by the court and made returnable before it, or whether it be allowed by a single judge and made returnable before him, is tested in the name of the chief-justice, which demonstrates that the writ is one issuing out of the court itself, for if, when issued by a single judge to be returned and heard before him, it became a proceeding before that judge as a statutory agent, it doubtless could not issue in the name of the presiding officer of the court and under its seal.

There is nothing in the case of *In re Margarum, 55 N. J. Law 12,* holding that a justice of the supreme court investigating the truth of the statement in a petition containing allegations of fraud or irregularities at an election is not empowered for, that purpose to sit in or under the authority of any court, but that the reference to him as a justice of the supreme court is a mere *designatio personæ*—which militates against the view I have expressed, to the effect that the chancellor or a single judge of the supreme court awarding, hearing and determining a writ of *habeas corpus,* sits in the *court* of which he is a judge. On the contrary, the

reasoning of the *Margarum Case* would seem plainly to indicate that in *habeas corpus* cases the judges sit in and exercise the jurisdiction of the courts, for, said Chief-Justice Beasley, in the *Margarum Case* (at *p. 15*) :

"It will be at once perceived, from this summary of this statutory clause, that the judge who is to determine the prescribed contest is not empowered for that purpose to sit in, or under the authority of, any court. The reference to him as 'the justice of the supreme court holding the circuit court in and for said county,' is a mere *designatio personæ*. The expression evidently confers upon the official no authority except such as is expressly prescribed, which is that he shall entertain the complaint in the capacity of a commissioner acting under and absolutely by the force of a statutory authorization. He is to determine the matter and make an order dismissing the petition or setting aside the election, and which order is to be filed with the clerk of the county. This is the entire scope and extent of the power expressly conferred, and it would not seem that, in such an affair, a justice of the supreme court has inherent in his office any ability that would materially subserve this statutory endowment. It is true that, as such justice, he is possessed of the statutory authority to take voluntary oaths and affidavits, but he could not compel the attendance of witnesses, nor could he punish their recusancy if they should refuse to be sworn. In the present inquiry, it is not pertinent to consider the serious question whether this entire provision relating to this method of determining the legality of these elections, is not so imperfect and incomplete with respect to the power conferred upon the judicial officer who is to decide the controversy, as to render the provision itself wholly nugatory, all our immediate concern being to emphasize the fact that such justice in executing the function in question does not sit *in curia*."

It will be noticed that the *Margarum Case* holds that the justice of the supreme court there sat in the capacity of a commissioner acting under authority *expressly prescribed in the statute,* and that he did not sit in a court because the proceeding did not inhere in his office of judge. Not so a *habeas corpus* proceeding

which is essentially judicial in character and a legal right existing at common law.

*In re Prudential Insurance Co. of America, 82 N. J. Eq. 335,* it was held that an order made by the chancellor appointing appraisers of the value of the capital stock of that company, pursuant to the provisions of the statute for mutualizing life insurance corporations, was not reviewable on appeal, because the chancellor, under that statute, acted as a legislative agent. A question undecided in the *Prudential Insurance Co. Case* was as to whether or not there exists, under our constitution, a distinction between the chancellor and the court of chancery, it being held that that was of no practical moment upon the motion before the court; and the decision went upon the ground that the statutory proceeding in question was reviewable by *certiorari* only, regardless of the fact that one of agencies that took part in it was "the court of chancery," and that that circumstance could not require the supreme court to forego its writ of *certiorari* or to share it with the court of errors and appeals, which the supreme court would be required to do if the aggrieved party might review such statutory proceeding in the court of errors and appeals by a direct appeal.

These cases of *In re Margarum* and *In re Prudential Life Insurance Co.* were ones in which a single judge exercised powers conferred and contained in particular legislative acts, and those powers, being entirely statutory and unknown to the common law, differ radically from the character of the jurisdiction on *habeas corpus*, which is one existing at common law (although to some extent regulated by statute), under high prerogative writs issued out of courts of justice, and heard and decided by those courts, or a single judge thereof exercising the jurisdiction of those courts in the particular matter.

It is pertinent to remark that our *Habeas Corpus* act of 1874 provides, in section 8, that all writs of *habeas corpus* shall be under the seal of the supreme court and shall be endorsed, if it be awarded by the court, by the chief-justice, or, in his absence, by the presiding officer of that court; if by a justice of the court, the endorsement shall be signed by him. Here is a direct statutory provision that the writs shall be under the seal of the su-

preme court, thus unequivocally making them judicial writs whether awarded by the court or by a justice of it.

I will now give some consideration to the form of the proceedings in the case at bar as bearing upon the question whether the proceeding was in court or before me as a statutory magistrate.

The petition for the writ is endorsed "In Chancery of New Jersey," and is addressed "To the Honorable Edwin Robert Walker, Chancellor of the State of New Jersey," as is the practice with reference to all bills and petitions. The writ presented to me was similarly endorsed. It contained an allocatur reading: *"This writ has been allowed by me this..........day of May, 1915; let it be sealed.  .................Chancellor."* I dated and signed it. The solicitor then signed the writ conformably to the practice in the case of all writs. Then the clerk in chancery signed and sealed it, and thereupon it issued, not out of my pocket but out of the court of chancery. It is tested in the name of the chancellor.

*Potts Ch. Prec.* does not contain any form of the writ either in the edition of 1841 or that of 1872. But in *Dick. Ch. Prec. (rev. ed.) 478*, is a form of the writ of *habeas corpus ad subjiciendum.* It is the form substantially followed in the case under consideration. In fact, the forms are all practically the same. Mr. Dickinson states the allocatur thus: "By the statute I allow this writ. Let it be sealed." Now, as the *Habeas Corpus* act of 1795, which legislated with reference to the chancellor and the court of chancery as well as the supreme court and the justices thereof, has been repealed, and, as the act of 1874 makes no reference to the chancellor or the court of chancery, there is now no statute which regulates the issuance of this common law writ out of chancery. Therefore, the allocatur on the writ presented to me very properly omitted the words "by the statute."

It would seem that writs of *habeas corpus* were not endorsed with an allocatur prior to the act of *31 Car. II.,* for that statute, in section 3, declares that to the intent that no sheriff, jailer or other officer might pretend ignorance of the import of any such writ, it was enacted, that all such writs should be marked *"Per statutum tricesimo primo Caroli secundi regis,"* and should "be signed by the person that awards' the same." Our act of March

11th, 1795, provided that all such writs should be marked "By the Statute" and "be signed by the person who awards the same." Whether the statute of *Car. II.* was ever in force in New Jersey, colony or state, appears to be doubtful. The supreme court, in *State* v. *Garthwaile, 23 N. J. Law 143*, observed (at *p. 146*) that the *Habeas Corpus* act of *31 Car. II.*, 1679, was not enacted in this state until after the Revolution. And the same court, in *Paterson* v. *State, 49 N. J. Law 326*, observed (at *p. 333*) that section 65 of the Criminal Procedure act when first enacted in 1799 seems to have superseded the provisions of section 7 of the *Habeas Corpus* act of *Car. II.* as enacted in this state in 1795. These cases intimate, though they do not decide, that the *Habeas Corpus* act of *Car. II.* was not in force in New Jersey until the enactment of 1795. It may be, however, that it was in force from the earliest colonial period down to 1795, for the supreme court, in *Stille* v. *Wood, 1 N. J. Law 162*, decided that the statutes of Charles and James respecting writs of errors extended here. In *State* v. *Mairs, 1 N. J. Law 335*, the supreme court (at *p. 337*) expressed no opinion upon the question whether the Coventry act of *22* and *23 Car. II.*, 1670, extended to this state. In *Den* v. *Spachius, 16 N. J. Law 172*, the supreme court (at *p. 176*) seems to recognize the existence of estates-tail in this state by virtue of the statute of *13 Ed. I.* (*de donis conditionalibus*), until that act was repealed by our act of June 13th, 1799. In *Den* v. *DuBois, 16 N. J. Law 285*, the supreme court (at *p. 295*) held that while the statute *de donis* had never been enacted in this state, it nevertheless was always considered as operative here before and after the Revolution down to June 13th, 1799, when our legislature enacted that no act of parliament should have force or be considered law in this state.

If the statute concerning writs of error and the statute *de donis* were in force in New Jersey until repealed by the act of 1799, I fail to see why the statute of *31 Car. II.* was not also in force. But, if it were, it was doubtless repealed by the passage of our *Habeas Corpus* act of March 11th, 1795, because our statute, in title and enacting clauses, was practically a re-enactment of the English statute, and, because it legislated upon the whole subject, it appears to have been, under the well-settled

rule, a repealer by implication of the earlier English statute, assuming that statute to have obtained here. *Camden* v. *Varney, 63 N. J. Law 325, 329; Tomlin* v. *Hildreth, 65 N. J. Law 438, 447; Hotel Registry Corp.* v. *Stafford, 70 N. J. Law 528; Mersereau* v. *Mersereau Company, 51 N. J. Eq. 382; Harrington's Sons Co.* v. *Jersey City, 78 N. J. Law 610.* But if the passage of our *Habeas Corpus* act of March 11th, 1795, did not, by implication, repeal the statute of *31 Car. II.*, that act was expressly repealed by the act relative to statutes passed June 13th, 1799, *supra,* which provided that from and after its enactment no statute or act of the parliament of Great Britain should have force or authority within this state or be considered as a law thereof. *Pat. Rev. 435 § 4* (at *p. 436*).

This is important only, if at all, on the question of an allocatur on the writ of *habeas corpus* issued out of chancery. As there is now no statute regulating the writ in that court, there seems to be no regulation as to whether the writ should bear an allocatur, and, if so, how it should be worded. However, I think that the course of practice, which has existed for over two centuries, of endorsing these writs should be continued, and that in the court of chancery they should simply be endorsed *"This writ is allowed: Let it be sealed."* And the allocatur should be signed by the chancellor, or the vice-chancellor advising its allowance, in an appropriate order. The power of the vice-chancellors in this regard will be adverted to later.

As the declaratory statute of 1878, acknowledging the chancellor's power to issue the writ to be extant, notwithstanding the repeal of the act of 1795, and the passage of that of 1874, did not bestow the power, therefore the writ issued by the chancellor out of the court of chancery is always the common law writ, and the allocatur should omit the words "by the statute," unless, perhaps, the writ be issued under such an act as that concerning minors, &c. (*Comp. Stat. p. 2810 § 24*) ; but even there the writ is not given as a statutory remedy; it is merely referred to as the proceeding under which the *custody* of an infant is to be determined. Doubtless, however, it is quite immaterial that the allocatur on a chancery *habeas corpus* may contain the words "by the statute," because if the writ does not so issue the words

would be mere surplusage, and an allocatur after all is only the *fiat* by which the writ issues and is no part of the writ itself.

Now, holding, as I do, that the chancellor's power and duty with reference to the writ of *habeas corpus* is always in the court of chancery, it follows that section 111 of the Chancery act (*Comp. Stat. p. 450*), which provides that all persons aggrieved by any order or decree of the court of chancery may appeal from the same or any part thereof to the court of errors and appeals, gives the right of appeal to a person unsuccessfully prosecuting a *habeas corpus* case in chancery. This provision comes down to us from Paterson's Chancery act of June 13th, 1799.

That a proceeding on *habeas corpus* is a suit or cause has been decided by the highest authority. In *Ex parte Tom Tong, 108 U. S. 556; 27 L. Ed. 826,* it was held:

"When there is a criminal prosecution against one, a writ of *habeas corpus,* which he has obtained to inquire into the legality of his detention thereon, is not a proceeding in that prosecution, but is a new suit to enforce a civil right."

*Habeas corpus* is a civil suit or proceeding. *Bail. Hab. Corp., § 4 p. 11.*

The same doctrine is laid down in *Ex parte Milligan, 4 Wall. (U. S.) 107, 112; 18 L. Ed. 281.* Therefore, plainly, when a prisoner petitions for a writ of *habeas corpus* out of chancery, he thereby commences a suit and prosecutes a cause in that court; and, being aggrieved by the decision, may appeal to the court of errors and appeals.

### HABEAS CORPUS POWER OF THE VICE-CHANCELLORS.

This question is not involved in the case before me, but because I find that *habeas corpus* is a common law writ issuing out of the court of chancery whose jurisdiction with respect to it is preserved and protected by the constitution, and because Chancellor McGill held in *Buckley* v. *Perrine, 54 N. J. Eq. 285* (at p. *292*), that it is not a prerogative writ of a court whose jurisdiction with respect to it is so preserved and protected, and that (therefore) the legislature has power to extend its use to the vice-chancellors, I cannot afford to pass the question *sub silentio.*

Chancellor McGill asserts that the vice-chancellors' power is dependent upon the statute of 1889.

I pause here to ask to what chancery power the legislature of 1878 referred in its act declaring the right of the chancellor to issue the writ under the seal of the court notwithstanding no existing statute gave him the right, if it was not the common law right which was part of its inherent jurisdiction? I can conceive of no other. The declaratory act did not revive the statute of 1795. It did not attempt to do so, and if it had, the constitutional inhibition of article 4, section 7, paragraph 4, that "no law shall be revived * * * by reference to its title only, but the act revived * * * shall be inserted at length," would have prevented any such revivor.

Chancellor McGill evidently did not mean that *habeas corpus* is not a prerogative writ, for that it is such appears to be unquestionable; but only that the chancery jurisdiction to issue it was not preserved and protected by the constitution. In this it is apparent that he erred.

Sir William Blackstone said the writ of *habeas corpus* "is a high prerogative writ," *supra*. Chief-Justice Marshall said the same thing in delivering the opinion of the supreme court of the United States in *Ex parte Watkins, supra*. Then too *habeas corpus* falls strictly within the definition of a prerogative writ, namely, one that does not issue as of right but at the discretion of the court, that is, one that has to be allowed by the court or a judge thereof in the exercise of a sound judicial, and not an arbitrary, discretion. Of course *habeas corpus* is a writ of right when cause appears for its issuance, but cause must always be shown. Blackstone, quoting Lord Chief-Justice Vaughan, says:

"It is granted on motion, because it cannot be had of course; and there is therefore no necessity to grant it, for the court ought to be satisfied that the party hath a probable cause to be delivered." *3 Bl. Com. 132.*

The writ is one of right only when the applicant shows himself entitled to it. *Church Hab. Corp. (2d ed.), § 77,* and *note 1; Bail. Hab. Corp., § 5 p. 13.* The writ ought not to issue unless the court is satisfied that the case is a proper one. *State*

v. *Lyon, 1 N. J. Law 403.* Because it does not issue of strict right but only on proper cause shown to the court it is a prerogative writ, and as such, vouchsafed by our constitution of 1844 to the courts then possessing jurisdiction over it—among them the court of chancery.

As Lord Eldon overruled Lord Nottingham's decision to the effect that chancery had no power to grant a *habeas corpus* in vacation, because it was "against the stream of authority," I think I am bound to disapprove of Chancellor McGill's holding in *Buckley* v. *Perrine* that *habeas corpus* is not a prerogative writ preserved to the court of chancery by the constitution, because his decision, too, is against the authorities. See *Flanigan* v. *Guggenheim Smelting Co., supra,* and cases cited. This matter cannot be left here, for in view of what Chancellor McGill has said, and in view of what I have said, the power of the vice-chancellors with reference to *habeas corpus* should be correctly stated.

Now, as writs of *habeas corpus* issue out of the court of chancery, whence is the power of the vice-chancellors to cause their issuance derived? It is not difficult to find. Chancellor McGill says it exists by virtue of the statute of 1889, because the writ is not one preserved to the court by the organic law. This, as already stated, I reject. That is, I deny that it is not a jurisdiction of the court protected by the constitution. And if the vice-chancellors' jurisdiction may not depend upon the statute because the writ is within the exclusive jurisdiction of the court itself, the vice-chancellors' powers with reference to it must be vindicated on other grounds.

Before treating of that topic I think I ought to say that the court of errors and appeals in reversing Chancellor McGill in *Buckley* v. *Perrine* for other reasons (see *S. C., 55 N. J. Eq. 514*) observed that it might be assumed that the authority conferred by statute on the vice-chancellors to grant writs of *habeas corpus* is such as law judges possess to free prisoners from illegal restraint, and not the prerogative which exists in chancery to provide for the permanent custody of infants; and that court passed *sub silentio* the learned chancellor's assertion to which I have just adverted.

There never was a time when the chancellor could not have officers to assist him in discharging his judicial duties. These officers were masters of the court, and they still exist with all of their pristine powers. The office and jurisdiction of master in chancery appears not to have been comprehensively treated of in any of our decisions, and as they are incidentally here involved, I will now attempt to give some account of them; especially as the powers of the masters are the basis of the jurisdiction of the vice-chancellors.

An interesting dissertation upon the constitution and jurisdiction of the court of chancery of this state is contained in *Griff. L. R. (N. J.) 1183.* It is there stated that it does not distinctly appear how the court was composed until 1705; that in that year Lord Cornbury, by virtue of his commission as governor, giving him full power and authority, with the advice and consent of the council, to constitute and establish so many courts of judicature as he or they should think fit and necessary for the hearing and determination of all causes, criminal and civil, according to law and equity, passed an ordinance, by and with the advice of the council, erecting and establishing a high court of chancery in the province of New Jersey to be composed of himself, or the governor or lieutenant governor and council for the time being, and as such, to hear and determine all causes and suits which from time to time should come before them, in such manner or as near as may be, according to the usage and custom of the high court of chancery in England; with power to make and ordain rules and orders for regulating the practice of the court and the officers thereof, as they should think fit. This ordinance continued in force until 1770 when Governor Franklin by virtue of the power and authority given to him in his commission, and by and with the consent of the council, by ordinance constituted himself the chancellor and judge of the high court of chancery of New Jersey, with power to hear and determine all causes, and to nominate, constitute, appoint and commission all such and so many masters, clerks, examiners, registers and other necessary officers as should be needful to holding the court and doing the business therein, &c.

For an account of the organization of the court of chancery see also *Cleven. & Keasb. Cts. of N. J. 118 et seq.*

Governor Franklin continued in office until the constitution of 1776 was adopted. That instrument in article 8 provided "that the governor, or in his absence, the vice-president of the council, shall * * * be chancellor of the colony." This clothed him with all the powers of the colonial court of chancery. If anything were wanting to that effect it was supplied by the legislature a few months after the adoption of the constitution of 1776, which enacted that the several courts of law and equity should be confirmed, established and continued with like powers, as they were held at and before the Declaration of Independence. See *Pennsylvania Railroad Co.* v. *National Docks Railway Co., 54 N. J. Eq. 647* (at *p. 652*).

The governor or vice-president of the council, for the time being, continued to preside in the court of chancery until the adoption of the constitution of 1844, in which it is provided in article 6, section 1, paragraph 1, that "the judicial power shall be vested in * * * a court of chancery," among others, and in section 4, paragraph 1, that "the court of chancery shall consist of a chancellor."

By the constitution of 1844 the court of chancery was in effect declared to possess all of the jurisdiction inhering in it by force of its original institution. See the remarks of Chief-Justice Beasley as to the constitutional power of the court of errors and appeals in *Pennsylvania Railroad Co.* v. *National Docks Railway Co., supra* (at *p. 653*), which are equally apposite as to the court of chancery. It will be observed that no new powers were devolved upon that court, and none already existing were taken away by either constitution.

Now, it is to be observed that the ordinance of Lord Cornbury clothed the chancellor with power to regulate the practice of the court of chancery and the officers thereof, and that of Governor Franklin to appoint as many *masters and others officers* as should be needful to holding the court and *doing the business* therein. As the duties to be performed by these officers are in neither ordinance set out, they must of necessity, have been according to the usage and custom of the high court

*85 N. J. Eq.*            In re Thompson.

of chancery in England, whose powers were thus devolved upon our own court of equity.

The *principal* officer of the English court of chancery is the lord chancellor. *Com. Dig. Ch. B.* The master of the rolls, an officer as ancient as the court itself, has judicial capacity to *sit in the court for the chancellor,* and his decrees are of the same force as those of the chancellor himself. *Ibid. B. 5.* There are twelve masters in chancery, *assistants to the chancellor. Ibid. B 5.* In the reign of Henry VIII., the master of the rolls was sometimes styled vice-chancellor. *1 Spenc. Eq. Jur. 358.*

In the *Pr. Reg. Ch. (1714) 233,* title, "Masters of the Rolls, and the rest of the Masters in Chancery," it is said (at *p. 236*), speaking of the "masters in chancery :"

"Their Office seems originally to have been partly to sit as Assistants with the Chancellor; and still two or three of them, by Turns, sit with him at Westminster in Term-time, and two at a Time when he sits out of Term; and two of them sit with his Honour the Master at the Rolls."

And (at *p. 238*) :

"The Business in Equity encreasing, and the Masters Business in forming Writs decreasing or disused, the Lord Chancellors have of late Time referred Matters of Account, and such like, to their Examinations, which are ordinarily decreed according to their Certificate or Report."

An account of the masters in chancery is given in *8 Encycl. L. Eng.* (at *p. 273*), as follows:

"In the Court of Chancery there were originally certain officers who were styled Masters in Ordinary. They were eleven in number, besides the Master of the Rolls, who was the chief of them. The Accountant-General, who acted in all matters relating to the funds and effects of the suitors placed in the bank in his name and with his privity as directed by the decree or order of the Court, was one of the Masters. The rest of the body executed the orders of the Court upon references made to them. The office was one of great antiquity."

In *Hoffm. Mas. Ch. (N. Y. 1824) XXI.,* it is stated:

"In general there is *no question of law or equity,* or disputed fact, which a Master may not have occasion to decide, or respecting which he may not be called upon to report his opinion to the court."

The sitting of masters with the chancellor, apparently once a part of our practice, has long since been disused, but is recognized as a power still extant by section 80 of the Chancery act (*Rev. 1902; Comp. Stat. p. 440*), which provides:

"Whenever the chancellor shall deem it necessary to call to his assistance one or more of the masters in chancery to advise with, upon the hearing of a cause, or an argument, or upon matter of importance, or when any matter shall be referred to any of said officers, pursuant to the general rules of said court, or by any special order or decree in any cause, matter or proceeding depending therein, the fee for such services shall be proportionate, as nearly as may be to the actual value of such service, and shall be regulated by the chancellor from time to time."

In 1867 the legislature passed an act authorizing the chancellor in case of sickness or temporary absence from the state to authorize a master in chancery to grant and dissolve injunctions and perform other duties of the chancellor not including the final hearing and determination of causes, to the same effect as if done by the chancellor in person. This has continued to be the law and has been acted upon on numerous occasions. This power is contained in section 89 of the present Chancery act. *P. L. 1902 p. 539; Comp. Stat. p. 445.* But this is not the authority under which an injunction master is appointed. By rule 121, in the absence of the chancellor from Trenton, a petition for injunction addressed to him may be presented to such master residing there as the chancellor should designate, which master has the power to report upon the propriety of issuing the injunction prayed for, and if he reports that it ought to go, it is issued by the clerk. Injunctions now issue upon the determination of a vice-chancellor advising the same. See rule 131. In 1912, the chancellor appointed an injunction master in Trenton, the office having been vacant for several years, because at times solicitors and counsel desire to make application for such writs when the chancellor is temporarily absent from that city, and no vice-chancellor happens then to be therein. See rule 204*b*. The office of injunction master also existed in the New York court of chancery. *1 Hoffm. Ch. Pr. 21.* And that court, like our own was possessed of powers co-extensive with those of the high court of chancery in England.

*Ibid. 1.* The same jurisdiction is possessed by the Delaware court of chancery. *Fox* v. *Wharton, 5 Del. Ch. 200.*

The master's office is a branch of the court. *3 Edw. Ch. 458.* This is well illustrated in *VanNess* v. *VanNess, 32 N. J. Eq. 729*—an accounting case between partners after dissolution—where the master, after preparing his report and before filing it, did not give the parties an opportunity to appear before him, and Chief-Justice Beasley, speaking for the court of errors and appeals (at *p. 731*), said:

"To show that this is the proper course, the English books are referred to, but it is not necessary to look into these authorities, as the practice in this particular, in this state, is settled in immemorial usage. The course here is for the master to take the testimony of the litigants, and after that is in, to hear the arguments of the respective counsel." This happened to be an accounting case, but equally in any other, the party or parties, whose interests are before a master on a reference, cannot be sent away from him unheard. He sits for the chancellor and acts judicially within the scope of the power committed to him.

Now, the statutory master provided for in section 89 of the present Chancery act is appointed when the chancellor is ill or leaves the state, while the injunction master is designated under the inherent power of the court to appoint officers and assistants for the transaction of the business therein. The legislature has given full recognition to this power.

Chancellor Magie, in *Gregory* v. *Gregory, 67 N. J. Eq. 7* (at *p. 10*), said:

"The introduction of vice-chancellors into our system of chancery jurisprudence arose from legislation based on the ancient right of the chancellor to call upon the masters of his court for their advice as to his action in causes and proceedings pending before him. When that legislation was first adopted, the business of the court had outgrown the power of the chancellor to dispose of it alone. For the purpose of enabling the court to deal with the increasing business therein, the legislature gave authority to the chancellor to appoint an officer, to be called a vice-chancellor, to whom he might refer causes for

trial, and who might try the causes thus referred upon evidence orally taken, and was required to report to the chancellor his opinion and advise what decree should be made therein. As the business of the court still further increased the legislature, with wise liberality, from time to time, has authorized the appointment of additional vice-chancellors, and by this system the court of chancery has practically been enabled to keep pace with its business. The utility of the system has been established in its existence for over thirty years, and its recognition by all departments of the state government, executive, legislative and judicial, has given it a sanction beyond dispute or question."

Chancellor Magie mentions only the reference of causes for trial, but the Chancery act (*Comp. Stat. p. 447 § 96*) provides that the chancellor may refer to the vice-chancellors

"any cause or other matter which at any time may be pending in the court of chancery, to hear the same for the chancellor, and to report thereon to him and advise what order or decree should be made therein."

As soon as a bill or petition for relief is filed a cause or matter at once becomes pending in the court of chancery.

The present rule 204*a* makes general reference to vice-chancellors of sundry applications without special orders, and among them, applications for writs of *habeas corpus* to be issued out of the court of chancery under its general jurisdiction, and hearings on the return. This rule has the sanction of the court of errors and appeals, for in *Delaware Bay, &c., Railroad Co.* v. *Markley, supra—45 N. J. Eq.* (at *p. 148*)—Chief-Justice Beasley, speaking for that court, said:

"And, as the rules of the court are now framed, there does not appear to be any power given to the vice-chancellors to take cognizance of causes so as to finally dispose of them, upon the merits, except when there exists a special order for that purpose," which is a decision to the effect that cases and matters, including final hearings, may be delegated *in limine* to the vice-chancellors without a special order of reference in each particular case, provided there be a rule of general reference. The *Markley Case* was decided in 1888, and the rule of general reference was first adopted in 1901.

Whether writs of *habeas corpus* were issued out of the court of chancery upon the fiat of vice-chancellors prior to the act of 1889, I am unaware. That act is now section 3c of the *Habeas Corpus* act (*Comp. Stat. p. 2640*), and reads as follows:

"That the vice-chancellors, or either of them, shall have the same jurisdiction, power and authority to grant all writs of *habeas corpus*, and to hear and determine the same, that the chancellor of this state now has, and he or they shall proceed in the same manner."

So far as this statute, which is the one dealt with by Chancellor McGill, purports to clothe the vice-chancellors with the power of the chancellor, it may be invalid; and yet it may be efficacious to give them that power as "vice-chancellors," that is, as assistants of the chancellor, to award the writ in the same manner, and to the same extent, that they may assist him in all other causes or matters pending in the court of chancery. The formula in which the enactment was cast may be inappropriate, and it may have attempted to devolve upon the vice-chancellors an original jurisdiction which cannot be bestowed by statute because that would detract from the chancellor's exclusive constitutional power in that regard, but that may not prevent the act from operating, so far as it may be operative, to clothe the vice-chancellors with power in reference to the subject-matter legislated upon, as assistants to the chancellor, as already stated. But, whether so or not, as I have, I think, abundantly shown, their jurisdiction is complete by delegation from the chancellor under the authority inhering in his general power derived from the high court of chancery in England and devolved upon our court of chancery by the ordinances of Lord Cornbury and Governor Franklin, and ratified by the constitutions of 1776 and 1844.

Before leaving this subject, I think I ought to say that if the statute of 1889, granting vice-chancellors *habeas corpus* jurisdiction, be unconstitutional, neither lapse of time nor connivance can ripen it into law. *State* v. *Wrightson, 56 N. J. Law 126, 206.* Approved and followed. *Smith* v. *Baker, 73 N. J. Law 328.* But, even assuming it to be void, proceedings under the act are undoubtedly valid according to the doctrine of *Lang* v.

*Bayonne, 74 N. J. Law 455.* See, also, *In re Public Utility Board, 83 N. J. Law 303, 306; State* v. *Toth, 86 N. J. Law 247.*

In my opinion the vice-chancellors, who are appointed by the chancellor under the statute creating the office of vice-chancellor, are clothed with the *habeas corpus* power, as well as the injunctive, *ne exeat* and other powers, as to which latter there appears never to have been any question. And this, doubtless, because the chancellor could devolve these powers upon his assistants without legislative aid or sanction. And this appears from the highest authority. In *Delaware Bay, &c., Railroad Co.* v. *Markley, supra,* it was held by Chief-Justice Beasley, speaking for the court of errors and appeals—*45 N. J. Eq.* (at *p. 148*)—that "It was lawful for the chancellor to refer the present litigation to either of the vice-chancellors or to a master in chancery for consideration and advice in the usual course."

The litigation referred to was the appointment of a receiver for an insolvent corporation, which was on a *final hearing. Pierce* v. *Old Dominion, &c.; Smelting Co., 67 N. J. Eq. 399; Bull* v. *International Power Co., 84 N. J. Eq. 6.*

This "usual course," referred to by the learned chief-justice, was oft pursued before the advent of vice-chancellors, which was in the year 1871, the first one being the late Hon. Amzi Dodd, whose earliest opinion is reported in *22 N. J. Eq.* In turning over the leaves of the reports from that volume back to the first one of the series, I found forty-nine opinions of masters who sat for the chancellor, as follows: Seven in *1 N. J. Eq.;* seven in *3 N. J. Eq.;* one in *4 N. J. Eq.;* one in *6 N. J. Eq.;* one in *9 N. J. Eq.;* one in *10 N. J. Eq.;* one in *11 N. J. Eq.;* two in *16 N. J. Eq.;* fifteen in *17 N. J. Eq.;* eight in *18 N. J. Eq.;* two in *20 N. J. Eq.,* and three in *21 N. J. Eq.* These were not ordinary references to state accounts, to find the amount due on encumbrances in foreclosure cases, to ascertain the interests of parties in partition suits, and the other innumerable questions that are referred to masters with specific instructions, but were final hearings, or the hearing of injunction matters and the like, involving judicial questions. I have selected a few at random to illustrate the course of practice, which, in turn, illustrates the power of the court and of the masters, as follows:

*Cammann* v. *Executor of Traphagen, 1 N. J. Eq. 230.* The caption is as follows:

"This cause came on to be heard upon the bill, the plea of a judgment recovered at law, replication and proofs taken in support of the plea, before E. Van Arsdale, the master called to advise the chancellor, &c. * * * The master reported the following opinion," &c.

*Wooden* v. *Morris, 3 N. J. Eq. 65:*

"The chancellor * * * called in George K. Drake, Esq., one of the masters of the court, to advise with him," &c.

*Varick's Executor* v. *Crane, 4 N. J. Eq. 128:*

"The chancellor, having been of counsel for one of the parties, the cause was heard upon the pleadings 'and proofs, before Philemon Dickerson, Esq., one of the masters of the court, who was called to advise with the chancellor upon the hearing."

*Hewitt* v. *Crane, 6 N. J. Eq. 159:*

"This cause was heard by Stacy G. Potts, Esq., one of the masters of the court, the chancellor having been concerned as solicitor and counsel for the complainants—the counsel of the respective parties having requested that Mr. Potts might be selected to hear the cause.

"The facts of the case appear fully in the opinion delivered by * * * Stacy G. Potts, master."

*Paterson and Hudson Railroad Co.* v. *Jersey City, 9 N. J. Eq. 434:*

"This cause was referred by the chancellor to George H. Brown, one of the masters of the court. The material facts disclosed by the bill, and the causes assigned as grounds of demurrer, appear in the opinion of the master."

*Gifford* v. *New Jersey Railroad Co., 10 N. J. Eq. 172:*

"The case is sufficiently stated in the advisory opinion of Robert Vanarsdale, Esq., master, called to advise with the chancellor in the case."

*Isham and Wetmore* v. *Delaware, Lackawanna and Western Railroad Co., 11 N. J. Eq. 227, 230:*

"W. Pennington, master, sitting for the chancellor, who had been counsel for some of the parties before his appointment."

*Morris Canal and Banking Co.* v. *Central Railroad Co., 16 N. J. Eq. 419, 420:*

"The cause was heard, by direction of the chancellor, before James Wilson, Esq., one of the masters of the court, upon the rule, upon the bill, answers and affidavits."

*Whitney* v. *Robbins, 17 N. J. Eq. 360, 362:*

"The cause was argued before A. O. Zabriskie, Esq., master, sitting for the chancellor."

*Jackson* v. *Grant, 18 N. J. Eq. 145, 146:*

"This cause was argued upon a motion to dissolve the injunction. The facts of the case fully appear in the opinion of the master." Chief-Justice Beasley.

*Seymour* v. *Long Dock Co., 20 N. J. Eq. 396, 399:*

"This cause was argued before the Hon. Thomas P. Carpenter, one of the masters of the court, sitting for the chancellor, on bill, answer, replication and proofs."

*Wetmore* v. *Midmer, 21 N. J. Eq. 242:*

"This cause was argued before the Hon. Joseph F. Randolph, one of the masters of the court, sitting for the chancellor, on demurrer to a bill for injunction."

Thus, it clearly appears that the intention of the legislature in creating the office of vice-chancellor was to authorize the chancellor to appoint a high master of his court by a name appropriate to the dignity and importance of the office, with compensation to be provided by the state commensurate with the services to be performed by those functionaries. This was called for by the great increase in the population and business in the state and the consequent increase in the volume of litigation in the court of chancery, which outgrew the power of the chancellor to dispose of it alone, and the disposition of which by masters, for the meagre compensation allowed those officials, was entirely disproportionate. The legislature has, with wise liberality, as was remarked by Chancellor Magie, in *Gregory* v. *Gregory,* increased the number of vice-chancellors from time to time as occasion has imperatively required, and has provided for advisory masters to relieve the congestion of the court. The matter of providing proper compensation for assistants to the chancellor

in the court of chancery was the main, if not the only, purpose of the act providing for the appointment of vice-chancellors, as their judicial powers are derived solely from the court and not from the legislature. The policy of New Jersey is to administer justice at its own expense. And this seems to be the policy of all enlightened countries.

A perfect analogy exists with reference to the prerogative court, in which the legislature has authorized the appointment of vice-ordinaries. In *Griff. L. R. (N. J.) 1185*, we find this explanation of the ordinary's jurisdiction:

"By the instructions and commission of Lord Cornbury it appears, that at the surrender of the government to Queen Anne in 1702, the whole ecclesiastical jurisdiction over New Jersey, was reserved to the Lord Bishop of London, excepting only the collating of benefices, granting licenses to marry, and the probate of wills, which were granted by the governor.

"The only one of the English ecclesiastical courts adopted by the constitution of 1776 was that of the 'ordinary,' the governor, by that instrument, having the powers of this court vested in him.

"The ordinary under the English ecclesiastical system, is the bishop of a particular diocese, having among various other powers in no way belonging to the ordinary here, the right of proving wills, granting letters of administration, and appointing guardians of orphan children under fourteen years of age, within his diocese, all which he exercised in person or by his surrogate."

Mr. Dickinson, in his excellent treatise on probate practice (*Dick. Prob. Ct. Pr. 5*), speaking of the surrogates appointed by the ordinary, says:

"The surrogate acting as his deputy had also jurisdiction of all cases submitted to him, unless some special restrictions were inserted in his commission."

In colonial times, and later, the surrogates were appointed by the ordinary as his deputies. *Cleven. & Keasb. Cts. 128, 129; Ex parte Coursen, 4 N. J. Eq. 408*. The ancient office of surrogate, as deputy or assistant to the ordinary, is the source of power in the vice-ordinaries, just as that of master of the rolls and master in chancery is the groundwork of the jurisdiction of the vice-chancellors.

This matter of having assistants to the ordinary was legislated upon as long ago as 1830, and by an act passed February 19th of that year, it was provided:

"That it shall and may be lawful for the Ordinary or Surrogate-General of this state, in any case in which he may be interested, or may have been concerned for either party, or may have given an opinion as attorney, solicitor or counsel for either party, or in any other case in which he may deem it expedient, to call to his assistance any one or more of the Justices of the Supreme Court, to sit and advise with him on the hearing or arguments of any such case, or any motion touching the same, and by and with the advice of such Justice or Justices of the Supreme Court, to make and pronounce such order, sentence or decree, as shall be according to law, and the rules and practice of said Prerogative Court."

This statute, I find, was acted under in *Sloan* v. *Maxwell, 3 N. J. Eq. 563; In re Maxwell, Ibid. 611,* and is section 80 of the present Prerogative Court act. *Comp. Stat. p. 1723.*

### AS TO BAIL.

It is true that our constitution provides that all persons shall, before conviction, be bailable by sufficient sureties, except for capital offences where the proof is evident or presumption great. Article 1, section 10. But this, like the provision, that the right of trial by jury shall remain inviolate (article 1, section 7), which does not enlarge the right, is not intended to extend bail to cases where it did not previously obtain.

As our constitutional provision is, that all persons before conviction shall be bailable, the provision does not extend to persons who may not be convicted under *our* laws. As we have no power to convict an offender against the criminal laws of the State of New York, we have no power to enlarge on bail a person accused of an offence against the laws of that state, although he may be arrested here for prosecution there, unless that power resides in the authority whereby such person is here arrested and either transported or discharged, or, perhaps, in a statute of this state. I do not say that our legislature could not extend bail to such cases—only that it has not done so as to persons taken up on extradition warrants. It has done so with reference to persons

charged with crime committed in another state and held to await requisition papers or executive action. There may be good reason for bailing a person preliminarily accused, and in denying bail after he shall have been delivered by the governor to the agent of a demanding state, to the end that he may be transported there. He has then been surrendered by one sovereignty to another. The cases which deny bail in this latter situation seem to proceed upon that theory.

Our state statute in aid of the execution of the federal law of extradition is to be found in sections 100 to 104 of the Criminal Procedure act. *Comp. Stat. p. 1851.* And section 104 provides:

"It shall be lawful for any magistrate, on satisfactory evidence under oath being presented to him that application has been made, or is about to be made by the authorities of any state to the governor of this state for the extradition of any person or persons within the jurisdiction of such magistrate, to issue a warrant or warrants for the arrest of such person or persons and to commit such person or persons to the county jail or to take bail for his or their appearance from day to day for a period not to exceed thirty days from the date of the arrest of said person or persons; provided, that any person or persons who may be so arrested and committed to the county jail shall not be detained or imprisoned for a longer period than thirty days."

For the thirty days during which a person may be held awaiting application to the governor of this state for his extradition, or executive action thereon, bail *may* be taken for his appearance from day to day; but the act contains no provision for any proceedings after the governor's warrant has issued or the time limit has expired. Thompson was arrested under this section. and bailed for appearance from day to day. He was then taken up on the acting governor's extradition warrant, and when so apprehended, sued out this *habeas corpus*.

*In re Herrman, 18 N. J. L. J. 146,* was a *habeas corpus* extradition case, and Mr. Justice Lippincott, before whom the matter was heard, observed (at *p. 148*) : "That the only object of the fifth section of that act was to provide a definite procedure, and to limit the detention to a period not beyond thirty days, and to authorize the magistrate in his discretion to admit to bail the fugitive for his appearance from day to day, for a period not to exceed thirty days. It perhaps conferred a power

which the magistrate before that time did not have, to admit the fugitive to bail, and it is a limitation upon his reasonable discretion as to detention as to the time beyond which the discretion shall not exist, and it generally establishes a definite course of procedure."

I take it that Justice Lippincott was quite right in his surmise that the power conferred upon a magistrate to take bail from day to day from a person arrested in extradition proceedings, was a power which before that time the magistrate did not possess.

There is no statute of this state authorizing a person charged with crime in another state, and arrested on our governor's warrant of extradition, to be admitted to bail here. No right to bail exists at common law in favor of a person taken up on an extradition warrant, for extradition is not a proceeding according to the course of the common law, and which, as before remarked, exists only between different nations by virtue of treaty obligations, and between the states of this union, by virtue of the constitution of the United States and federal and state statutes. In other words, there is no such thing as a common law right of bail in favor of persons taken upon extradition warrants. The decisions of other states which I have been able to find, bearing upon this question, are against the right to bail in this class of cases.

*In re Carrier, 57 Fed. Rep. 578,* the court pertinently said (at *p. 579*) :

"Obviously, a proceeding in extradition under the treaty and the act of congress of 1848 (*9 Stat. p. 302*), with a view to determine the probable guilt of the accused before executing the terms of the treaty is quite aside from the general course of criminal procedure. It is not a question whether larceny is a crime bailable at common law, or by our law, or by the law of Canada. The proceeding stands upon the statute only, and it is believed that no departure can be made from the statute in any substantial matter. It is said that in matters not mentioned in the statute the practice should be according to the course of our law. The matter of admitting to bail is not a question of practice. Since the time of Edward I. it has been regulated

by statute; and in our day, bail is not allowed in any case except in pursuance to some statute." See also *Matter of Goodhue (Mayor's Court), 1 Wheel. Crim. Cas. (N. Y.) 427, 433,* where a person taken up on a charge of committing a crime in Kentucky was jailed without bail.

While the subject of a writ of *habeas corpus,* being a fugitive from justice, may be kept until final disposition of a charge of assault with intent to murder, he cannot be bailed. *Ex parte Hobbs, 32 Tex. Cr. 312.*

Neither the constitution of the United States, nor the law of congress pertaining to the subject of extradition, nor any law of this state (Washington) authorizes the giving of bail in *habeas corpus* proceedings in extradition cases. *In re Foye, 21 Wash. 250.* In that case an order admitting a prisoner to bail pending his appeal on remand to the custody of the agent appointing by another state, after hearing on *habeas corpus,* was vacated and set aside by the court above. And it was held that "bail is not authorized pending appeal in *habeas corpus* proceedings in extradition cases, under the statutory provision that a writ may issue for the purpose of admitting a party to bail who is charged with an offence against the laws of the state."

The law does not authorize a party arrested on a warrant of extradition to go at large pending the action of the court. *Ex parte Erwin, 7 Tex App. 288, 296.*

I am aware that the supreme court of the United States in *Wright* v. *Henkel, 190 U. S. 40; 47 L. Ed. 948* (at *p. 956*), said:

"We are unwilling to hold that the circuit courts possess no power in respect to admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief. Nor are we called upon to do so, as we are clearly of opinion, on this record, that no error was committed in refusing to admit to bail, and that, although the refusal was put on the ground of want of power, the final order ought not to be disturbed," but this observation was preceded by the following remarks on the same page:

"The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment. And the same reasons which induced the language used in the statute would seem generally applicable to release pending examination.

"The subject was considered by the district court of Colorado in the case of *Carrier, 57 Fed. Rep. 579*, and Justice Hallet held that the matter of admitting to bail was not a question of practice; that it was dependent on statute; that although the statute of the United States in respect of procedure in extradition did not forbid bail in such cases, that was not enough, as the authority must be expressed; and that as there was no provision for bail in the act, bail could not be allowed.

"And Judge Lacombe in the present case stated that applications to admit to bail in such cases had, on several occasions, been made to the district court, and that they had been uniformly denied," which, it seems to me—notwithstanding the court was unwilling to hold that Wright could not be admitted to bail—was a clear intimation that bail was not demandable in these cases of international extradition.

The only case I find in which the right to bail in this class of cases was decided favorably to the accused was in a common pleas court in Connecticut, whose decision was reviewed in *Farrell* v. *Hawley, 78 Conn. 151*, in which the supreme court of errors of that state, speaking by Mr. Justice Baldwin, said (at *p. 155*) :

"It is assigned for error that the court of common pleas, after remanding the plaintiff to the custody of the sheriff by the judgment appealed from, refused to admit him to bail. As to this the trial court ruled that it had power at common law to accept bail, pending the appeal to this court, but in the exercise of its discretion refused to accept it. Assuming, with-

out deciding, that it was right in the first ruling of which the plaintiff does not complain, it was clearly right in holding that whether the power should be exercised was a matter of judicial discretion. We see nothing in the record to indicate that this discretion was not well exercised."

It is to be observed that the court of last resort in Connecticut did not decide that the court below was right in holding that it had power at common law to bail an accused person pending an appeal on *habeas corpus* in a requisition case; and therefore the lower court's decision, which is not reported, as an adjudication to the effect that bail is allowable in these cases, seems to be against the clear weight of authority. Furthermore, the lower court's holding that it had power to accept bail pending appeal seems to have been made with reference to bail generally, and not with reference to *habeas corpus* cases in extradition proceedings, which are *sui generis,* and in which there can be no common law right to bail, as extradition is not a common law proceeding.

In *Bail. Hab. Corp. (1913)*, it is laid down in section 123, (at *p. 507*) :

"It seems inconsistent that the several provisions of the statute, relating to the delivery of the party after commitment, to the demanding authority, that there should be power to admit to bail, such provision of the federal statutes being confined to crimes or offences against the United States."

The supreme court of Texas in *Ex parte Erwin, supra,* follows the same line of reasoning as the supreme court of the United States in *Wright* v. *Henkel, supra,* to the effect that if a fugitive from justice were permitted bail in the state where he was taken up, it might be impossible to fulfill the obligation to surrender him, as will appear from the following quotation from that case, *7 Tex. App.* (at *p. 295*) :

"Certainly if an appeal by a party arrested on a warrant of extradition is within the purview of the statute (authorizing appeals), the law makes no such exception in his favor as to authorize him to go at large pending the action of this court, and in a situation to defy its mandate and to treat its judgment with contempt."

And (at *p. 296*) :

"If upon arrest upon a warrant of extradition bail is allowable, the federal constitution is set at naught, and delivery in the state having jurisdiction of the offence would have its price, regulated generally by the amount of the bail bond, where one could be given at all, and a fundamental provision which was intended to apply to all classes of citizens would be restricted to the poor and unfortunate who were not able to furnish bail."

In *19 Cyc. 96*, it is said:

"A person who is arrested as a fugitive from justice on a warrant of the executive must be securely held. He is therefore not entitled to bail. If while on bail for another offence he is given up on extradition proceedings to the agent of another state his bail is discharged, but if while on bail for a crime he goes to another state and is there arrested on extradition proceedings from a third state his bail is forfeited."

My judgment is that the accused is not entitled to bail pending appellate proceedings.

Mr. Ingersoll—My impression was that the defendant was entitled to bail, and your honor so held when there was a continuance pending this proceeding.

The Chancellor—At the conclusion of the hearing I adjourned the matter until this day to consider the arguments and briefs of counsel on both sides, and to make an independent examination of the law of the case. I am now compelled to say that I erred in admitting the prisoner to bail *pendente lite*. I should have committed him to custody pending my decision. However, no actual harm has been done for the prisoner is now here before me subject to my order.

CUSTODY OF PRISONER PENDING HABEAS CORPUS.

I find it to be the duty of a judge who hears a cause on *habeas corpus* to commit the prisoner to custody as soon as he is produced in court in obedience to the command of the writ.

In *Barth* v. *Clise, 12 Wall. (U. S.) 400; 20 L. Ed. 393*, it was held:

"By the common law, upon the return of a writ of *habeas corpus* and the production of the body of the party suing it out, the authority under which the original commitment took place is superseded. After that time, and until the case is finally disposed of, the safe-keeping of the prisoner is entirely under the control and direction of the court to which the return is made. The prisoner is detained, not under the original commitment, but under the authority of the writ of *habeas corpus*. Pending the hearing he may be bailed *de die in diem,* or be remanded to the jail whence he came, or be committed to any other suitable place of confinement under the control of the court. He may be brought before the court from time to time by its order until it is determined whether he shall be discharged or absolutely remanded. *King* v. *Bethel, 5 Mod. 19; Bac. Abr. tit. 'Habeas Corpus,' B. 13; Anon., 1 Vent. 330; Sir Robert Peyton's Case, 1 Vent. 346; Hurd. Hab. Cor. 324.* We have not overlooked the statute of *31 Car. II*. This doctrine has been recognized by this court. *In re Kaine, 14 How. 134.*"

This was not an extradition case and is no authority on the question of bail in those matters.

Our *Habeas Corpus* act of 1874, in section 32, provides

"That until judgment be given upon the return of a *habeas corpus,* the court or justice before whom such party shall be brought may either commit such party to the custody of the sheriff of the county in which said court or justice shall be, or place him in such care or under such custody as the circumstances of the case may require."

When a person is brought before a judge on *habeas corpus* he should be instantly committed into some proper custody pending the proceedings, else, if he elope, the officer or other person producing him will not be liable for his escape. Ordinarily, I think, the subject of a writ should be committed to the custody of the officer or person producing him. Not so in cases where the accused has been taken up on a governor's extradition warrant and is in the custody of, and is produced by, the agent of the demanding state, who could not compel his incarceration in any of our jails awaiting the determination of proceedings. I understand the law to be, and our statute expressly permits it, that the

court, in such a situation, may commit the accused to any jail in the state; the custody of the prisoner *pendente lite* being entirely under the direction and control of the court to which the return is made. *21 Cyc. 372*, citing *Barth* v. *Clise, supra.* I should have committed Thompson to the jail of the county of Mercer, as I was sitting in Trenton, rather than to have sent him to the jail of the county of Atlantic, from which county he came, as that would have been inconvenient and more costly.

Mr. Ingersoll—Since your honor holds that the accused is not entitled to bail, he has instructed me to say that he will not take an appeal.

The Chancellor—Very well. It is my duty to remand him, and in this posture of the affair he will, of course, be transported to New York by Mr. Boyle, the agent appointed by the governor of that state. The assistant attorney-general will draw a proper order.

NOTE.—The particular case disposed of, namely, a *habeas corpus* proceeding by a man arrested on an executive warrant of extradition, who was denied discharge and remanded for transportation to another state for trial there on a charge of keeping a gambling-room, and being a common gambler in that state, is not of great importance, but the questions directly and incidentally raised are, and, as they are treated of in constitutions, statutes, text-books and reports, but not comprehensively in any one opinion in this state, I thought it worth while to elaborate the very full notes that I had made for the purpose of the oral opinion which I delivered upon the conclusion of the case, and to incorporate them into a written opinion which may prove useful to the governor for the time being when the law concerning extradition is involved, and to court and counsel whenever that, and the other questions treated of, may arise.